1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10
11

FRANCKO GRATTON,

                              Plaintiff,

12         v.

13    CITY OF TUKWILA, et al.,

14                              Defendants.

15

CASE NO. 2:22-cv-01598-TL

ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
PARTIAL SUMMARY JUDGMENT
AND DENYING MOTION TO
AMEND ANSWER

16        Plaintiff Francko Gratton brings this civil rights action concerning the discharge of a

17    police officer's rifle during a suspicious vehicle stop that injured him. The matter comes before

18    the Court on Defendants City of Tukwila, Jessica Armstrong, and Philip Glover's Motion for

19    Partial Summary Judgment (Dkt. No. 31) and their Motion to Amend Answer to Add

20    Affirmative Defense (Dkt. No. 26). Having reviewed the relevant record and governing law, and

21    finding oral argument unnecessary, *see* LCR 7(b)(4), the Court GRANTS IN PART and DENIES IN

22    PART the summary judgment motion and DENIES the motion to amend.

23        //

24        //

# I.   BACKGROUND

## A.  Procedural History

On November 11, 2022, Plaintiff Francko Gratton filed suit against the City of Tukwila, Officer Jessica Armstrong, and Sergeant Phil Glover for monetary damages after being shot and wounded by Officer Armstrong during a police encounter in Tukwila, Washington. Dkt. No 1, ¶¶ 2.1–2.4, 4.1, 4.14. He brings claims against all Defendants under: 42 U.S.C. § 1983; the Washington Law Against Discrimination ("WLAD"), RCW 49.60.030; the tort of outrage; and negligence.[1] *Id.* at 4–7. He also brings claims under *Monell* and theories of indemnification and *respondeat superior* against the City of Tukwila. *Id.* at 6–8.

Defendants filed their answers on January 27, 2023, and February 28, 2023. Dkt. No. 18 (Officer Armstrong's answer); Dkt. No. 22 (City of Tukwila's answer); Dkt. No. 23 (Sergeant Glover's answer). The Court set the deadline for amending the pleadings as March 31, 2023. Dkt. No. 21. On June 15, 2023, Defendants moved to amend their respective answers to include an affirmative defense of the "felony bar" under RCW 4.24.420. *See* Dkt. No. 26.

Shortly after filing the motion to amend their complaints, Defendants collectively filed a motion for partial summary judgment seeking dismissal with prejudice of most of Plaintiff's claims, including all claims against Sergeant Glover. Dkt. No. 31. Defendants note that while "Plaintiff has a colorable negligence claim against Officer Armstrong, and against the City of Tukwila under *respondeat superior*," the other claims lack factual or legal bases. *Id.* at 27. Alongside their summary judgment motion, Defendants have submitted several video recordings of the police encounter. Dkt. No. 33-2 (Officer Armstrong's bodycam footage), Dkt. No. 33-3 (Sergeant Glover's bodycam footage), Dkt. No. 33-4 (Officer Armstrong's dashcam footage).

---

[1] As addressed in Part III.A.5, *infra*, the complaint is ambiguous as to whether the negligence claim is asserted against Sergeant Glover. *See* Dkt. No. 1, ¶¶ 7.1–7.7.

**B.  The Police Encounter and Shooting**

Plaintiff provides an extremely pared-down discussion of the facts of the police encounter. In fact, Plaintiff describes the events of the November 13, 2020, incident at the center of this lawsuit in just three paragraphs. Dkt. No. 36 at 2–3. Plaintiff does not appear to dispute Defendants' statement of facts, instead only contesting Defendants' characterization of the injury inflicted.[2] *See id.* at 2–4. Therefore, for purposes of this motion, the Court accepts as undisputed and relies primarily on the narrative and evidence supplied by Defendants to relay the context in which the injury occurred. *See* Fed. R. Civ. P. 56(e)(2).

On the night of November 13, 2020, Tukwila Officers Jessica Armstrong and Kelli Greenhill responded to a call reporting a suspicious vehicle parked on a residential street around 2:30 a.m. Dkt. No. 31 at 2. The vehicle was parked with the driver's-side door abutting bushes, the windows were fogged up, and it was raining. *See* Dkt. No. 31 at 2. According to Defendants, upon arriving at the scene, Officer Armstrong twice confirmed (via dispatch and then via radio) that the license plates on the vehicle had been reported stolen. Dkt. No. 31 at 3. She recognized the plates as those reported on a getaway vehicle from a shoplifting call earlier that day and confirmed this on her in-car computer terminal. *Id.* Unsure whether the vehicle was occupied, she asked for an additional unit to assist. Dkt. No. 31 at 3; *see also* Dkt. No. 33-2 at 0:34–2:35. While awaiting back-up, Officers Armstrong and Greenhill remained parked in separate cars behind the vehicle, activated red-and-blue flashing lights, and shone their spotlights directly into

---

[2] Plaintiff's "Material Facts in Dispute" section lists the following:

1.  Whether Officer Armstrong accidentally or intentionally fired her weapon;
2.  Whether Officer Armstrong using her AR 15 rifle was excessive;[]
3.  Whether the plaintiff was complying with police commands at the time he was shot;
4.  Whether Officer Armstrong's mishandling of her weapon was the proximate cause of Plaintiff's being shot.

Dkt. No. 36 at 4.

the vehicle. Dkt. No. 31 at 3. Officer Armstrong twice yelled in the direction of the vehicle, asking for any occupants to identify themselves, but there was no response. Dkt. No. 31 at 3; *see also* Dkt. No. 33-2 at 3:15–3:19, 4:36–4:41. "Unbeknownst to the officers at the time, Plaintiff Francko Gratton and his female companion, Latoyia Scott were inside the running vehicle, both passed out after smoking heroin." Dkt. No. 31 at 3.

Shortly after Sergeant Phil Glover arrived on the scene, he and Officer Greenhill approached the vehicle's passenger-side front door, while Officer Armstrong approached the driver's-side door. Dkt. No. 31 at 3–4; *see also* Dkt. No. 33-2 at 10:34–10:47; Dkt. No. 33-4 at 10:20–10:49. Sergeant Glover and Officer Greenhill knocked on the passenger-side windows. Dkt. No. 31 at 4; *see also* Dkt. No. 33-2 at 10:30–10:33. Officer Greenhill commanded the passenger to open the window multiple times and asked for those inside to show their hands, to no response. Dkt. No. 31 at 4; *see also* Dkt. No. 33-2 at 10:33–10:47; Dkt. No. 33-3 at 1:10–1:30. In response to a question from Sergeant Glover, Officer Armstrong confirmed that the driver's seat was occupied and ordered, "Let me see your hands, driver." Dkt. No. 31 at 4; *see also* Dkt. No. 33-2 at 10:54–10:56. Ms. Scott (Plaintiff's girlfriend, Dkt. No. 36 at 2) eventually rolled down the passenger-side window several inches. Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 1:33–1:36; Dkt. No. 33-4 at 10:50–10:58. After this, the following exchange occurred:

- Officer Greenhill asked Ms. Scott to keep her hands up, and Sergeant Glover commanded, "Open the car door. Police department." Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 1:38–1:41.

- Officer Armstrong told Plaintiff to put his hands on the steering wheel. Dkt. No. 31 at 4; *see also* Dkt. No. 33-2 at 11:06–11:09.

- Ms. Scott opened the passenger-side front door. Dkt. No. 31 at 4; *see also* Dkt. No. 33-4 at 10:58–11:14. Sergeant Glover stated, "Keep your hands visible. You're

fine. The license plate on the back of this car is reported stolen. Any idea why that might be?" Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 1:42–1:55.

- Ms. Scott responded, "I'm sorry?" Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 1:54–1:56. (Defendants note that Ms. Scott had "obviously" just woken up and had a confused look. Dkt. No. 31 at 4.)

- Sergeant Glover restated that the vehicle's rear license plate had been reported stolen and reiterated his question. Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 1:56–2:04. Ms. Scott responded, "No." Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 2:03–2:04. Plaintiff responded, saying the car belonged to his aunt. Dkt. No. 31 at 4; *see also* Dkt. No. 33-3 at 2:04–2:16.

- Sergeant Glover asked Plaintiff if he knew why the license plate had been reported stolen and Plaintiff replied, "I have no idea." Dkt. No. 31 at 4; Dkt. No. 33-3 at 2:16–2:20. At this point, Sergeant Glover said, "Okay. Sir, I'm gonna need you step outside on your side, please, just for a moment. Keep your hands visible, please." Dkt. No. 31 at 4–5; *see also* Dkt. No. 33-3 at 2:15–2:26.

- Plaintiff looked over at Sergeant Glover and placed his right hand on the vehicle's gear shifter, placing it into reverse. Dkt. No. 31 at 5. He started to back up, despite all three officers standing directly next to the vehicle with weapons drawn. Dkt. No. 31 at 5; *see also* Dkt. No. 33-2 at 11:50–11:55; Dkt. No. 33-4 at 11:50–11:55. The car lurched backward. Dkt. No. 31 at 6; *see also* Dkt. No. 33-2 at 11:50–11:56; Dkt. No. 33-4 at 11:50–11:55. Plaintiff then moved the gearshift again, appearing to put the vehicle in drive and moved the steering wheel to the right, at which time the reverse lights turned off. Dkt. No. 31 at 6; *see also* Dkt. No. 33-4 at 11:51–11:55 (showing reverse lights turning on and then off).

- Sergeant Glover leaned into the vehicle and "jammed the gear shift back into park." Dkt. No. 31 at 6; *see* Dkt. No. 33-4 at 11:55–11:58. He also "dove his upper body back into the vehicle and began striking Gratton's hand with his flashlight," allegedly in response to Plaintiff repositioning his hand on the gear shift. Dkt. No. 31 at 7.

- During the struggle over the gear shift, Sergeant Glover "order[ed Plaintiff] at least five separate times to get out of the car," and warned him that he was going to get shot if he did not get out of the car. Dkt. No. 31 at 7; *see also* Dkt. 33-3 at 2:20–2:45 (Sergeant Glover yelling at Plaintiff, "No, do not put that. . . . Hey! Do you want to get f*cking . . . . Do you want to get shot, do you want to get f*cking shot?! Get out of the car right now, get out of the car, get out of the f*cking car! Get out of the car! You are going to get shot if you do not get out of the car!").

- When the vehicle began to move, Officer Armstrong tried to open the driver's door, but it was locked. Dkt. No. 31 at 7; *see also* Dkt. No. 33-2 at 11:50–12:00. Officer Armstrong used her rifle to "bang[]on" the driver's-side window and repeatedly ordered Plaintiff to open the door. Dkt. No. 31 at 7; *see also* Dkt. No. 33-2 at 12:00–12:04.

- Plaintiff "suddenly stopped fighting with Sgt. Glover and opened the driver's door." Dkt. No. 31 at 7; *see also* Dkt. No. 33-2 at 12:04–12:07.

- Officer Armstrong began to pull Plaintiff from the vehicle with her left hand when her rifle, which she was holding in her right hand, discharged. Dkt. No. 31 at 7. (Plaintiff notes, though not in his "Statement of Facts," that before the rifle discharged, Officer Armstrong "already had her rifle pointed at Mr. Gratton's back and her finger on the trigger." *See* Dkt. No. 36 at 8; *see also* Dkt. No. 33-2 at 10:46–10:56 (showing that Officer Armstrong had her rifle pointed toward the driver's-side

door prior to its opening); Dkt. No. 33-4 at 10:43–10:54 (same).) Plaintiff was struck

by a bullet which entered in his left upper back, glanced off his scapula just under the

skin, and came back out a few inches away. Dkt. No. 31 at 7, 8 (citing Dkt. No. 33-6

(photos of Plaintiff's injury); Dkt. No. 33-7 (emergency department notes)).

**C. Post-Shooting**

Officer Armstrong was placed on a four-month administrative leave following the

shooting. Dkt. No. 31 at 16; Dkt. No. 33-22 at 2. A team of detectives from the Valley

Independent Investigation Team conducted an inquiry into the shooting, compiling a nearly

200-page investigative report. Dkt. No. 31 at 9. According to one of the investigators, "[t]he

shooting was determined to be an accidental discharge due to the possibility of a sympathetic

reflex of Officer Armstrong grabbing Gratton's arm with her left hand and her right hand trigger

finger squeezing the trigger off the rifle as she takes a hold of him." Dkt. No. 33-8 at 7

(Detective Chris Edwards' investigation report). The investigative team referred the case to the

King County Prosecutor's Office, which declined to file charges. *Id.* at 15; Dkt. No. 33-10

(memorandum explaining prosecutor's declination to file charges).

The Tukwila Police Department then conducted its own internal review. *See* Dkt.

No. 33-12. Both the review and the Tukwila Police Manual list the four universal firearms safety

rules that are meant to be followed by all officers:

1. All firearms are always loaded
2. Never let the muzzle cover anything you are not willing to destroy
3. Keep your finger off the trigger until your sights are on the target
   and you are ready to fire
4. Be sure of your target and what is behind and beyond it

Dkt. No. 37-4 at 1 (Tukwila Police Manual); Dkt. No. 33-12 at 2. The review sustained findings

that while the discharge was accidental, Officer Armstrong violated safety considerations

regarding her use of her firearm as well as the Department's use of force policy. Dkt. No. 33-12

1    at 2–3; Dkt. No. 33-22 at 1, 4–6 (finding violations of the use of force policy and firearm safety

2    rule 3).

3          Post investigation, the Tukwila Police Department suspended Officer Armstrong without

4    pay for forty-eight hours[3] and required her to go through remedial training. Dkt. No. 31 at 11;

5    Dkt. No. 33-12 at 3 (Chief of Police Eric Drever's memorandum re: Disposition of Formal

6    Investigation); Dkt. No. 33-13 (memorandum re: remedial firearms training provided to Officer

7    Armstrong); Dkt. No. 33-14 (memorandum re: remedial vehicle contacts training provided to

8    Officer Armstrong); Dkt. No. 33-22 at 7.

9                          **II.   LEGAL STANDARDS**

10   **A.  Summary Judgment**

11         Summary judgment is appropriate where "the movant shows that there is no genuine

12   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

13   Civ. P. 56(a). The inquiry turns on "whether the evidence presents a sufficient disagreement to

14   require submission to a jury or whether it is so one-sided that one party must prevail as a matter

15   of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). A genuine issue of

16   material fact exists where "the evidence is such that a reasonable jury could return a verdict for

17   the nonmoving party." *Id*. at 248.

18         The court must draw all justifiable inferences in favor of the non-movant. *Id.* at 255. The

19   court does not make credibility determinations or weigh evidence at this stage. *Munden v.*

20   *Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021); *see also Lujan v. Nat'l Wildlife*

21   *Fed'n*, 497 U.S. 871, 888 (1990) ("[W]here the facts specifically averred by [the non-moving]

22

23   ───────────────

24   [3] Twenty-four of those hours were considered to have already been served by the time the discipline was imposed.
     *See* Dkt. No. 33-12 at 3.

party contradict facts specifically averred by the movant, the [summary judgment] motion must be denied.").

If the non-movant bears the burden of proof at trial, the movant only needs to show an absence of evidence to support the non-movant's case. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once such a showing is made, the burden shifts to the non-movant to show more than the mere existence of a scintilla of evidence in support of its case—the party must show sufficient evidence that a jury could reasonably find for the non-movant. *Id.* (citing *Anderson*, 477 U.S. at 252). In short, the Federal Rules of Civil Procedure "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322 (citing Fed. R. Civ. P. 56(c)).

**B.  Amendment of Answer**

Once a court has entered a scheduling order setting a timetable for amending pleadings, the "good cause" standard of Rule 16(b), rather than the liberal standard of Rule 15(a), of the Federal Rules of Civil Procedure governs a party's ability to amend their pleading. *See Johnson v. Mammoth Recreation, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992) (affirming denial of a belated motion to amend complaint); *see also Santillan v. USA Waste of Calif., Inc.*, 853 F.3d 1035, 1048 (9th Cir. 2017) (affirming denial of amendment where request to amend came eight months after the deadline). *Compare* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires.") *with* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause . . . ."). Good cause, for the purposes of Rule 16(b), primarily concerns whether a scheduled deadline could not " 'reasonably be met despite the diligence of the party seeking the extension.' " *Mammoth Recreation*, 975 F.2d at 609 (quoting Fed. R. Civ.

1    P. 16 advisory committee's note to 1983 amendment). However, if the party was not diligent,

2    "the inquiry should end." *Id.*

3                                    **III.    ANALYSIS**

4    **A. Summary Judgment[4]**

5              1.    **Section 1983 Claims**

6              Plaintiff brings claims against "all Defendants" for use of excessive force against him and

7    an unlawful seizure. Dkt. No. 1, ¶¶ 9.1–9.3. To succeed on a Section 1983 claim, a plaintiff must

8    show that they were deprived of a federal constitutional or statutory right by a defendant who

9    was acting under color of state law (*i.e.*, a state actor). *See* 42 U.S.C. § 1983; *Wright v. SEIU*

10   *Local 503*, 28 F.4th 1112, 1121 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 749 (2023). A defendant

11   can be held accountable under Section 1983 if they personally participated in causing the

12   deprivation, or if they "set[] in motion a series of acts by others which [they knew or reasonably

13   should have known] would cause others to inflict the constitutional injury." *Armstrong v.*

14   *Reynolds*, 22 F.4th 1058, 1070 (9th Cir. 2022) (quoting *Gilbrook v. City of Westminster*, 177 F.3d

15   839, 854 (9th Cir. 1999), *cert. denied*, 528 U.S. 1061); *cf. Brogdon v. Child.'s Admin.*, No. C19-

16   5332, 2019 WL 2472822 (W.D. Wash. June 13, 2019) ("a § 1983 suit . . . must allege the

17   defendant's own conduct violated the plaintiff's civil rights") (citing *City of Canton, Ohio v.*

18   *Harris*, 489 U.S. 378, 385–90 (1989).

19

20   ─────────────────────
     [4] Each Defendant asserted a qualified immunity defense in their respective answers but none raise the issue in their
21   summary judgment briefing. *Compare* Dkt. No. 18 at 6 (Officer Armstrong's answer), *and* Dkt. No. 22 at 7 (City of
     Tukwila's answer), *and* Dkt. No. 23 at 7 (Sergeant Glover's answer), *with* Dkt. No. 31 (summary judgment motion
22   filed by all Defendants), *and* Dkt. No. 38 (Defendants' reply to summary judgment response). By failing to raise
     qualified immunity as a ground for summary judgment, Defendants have waived consideration of the defense at this
23   stage of the proceedings. *See Bonnie Lopez v. State of Nev.*, No. C21-116, 2023 WL 9056866, at *14 (D. Nev. Dec.
     29, 2023) (following out-of-circuit precedent in the absence of direct authority from the Ninth Circuit and declining
24   to consider a qualified immunity defense raised in a reply brief at the summary judgment stage) (collecting cases);
     *see also Summer v. Kenton Cnty. Clerk's Off.*, 604 F.3d 257, 269–70 (6th Cir. 2010) (refusing to address qualified
     immunity defense that was raised in defendant's answer but not in his summary judgment motion).

Though Plaintiff attempts to bring his § 1983 claims against "all Defendants" (Dkt. No. 1, ¶¶ 10.1–10.5), the City of Tukwila cannot be held liable under this statute separately from Plaintiff's *Monell* claim (which is addressed *infra*, Part III.A.2) "solely because an injury was inflicted by its employees or agents." *See Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). Therefore, the Court analyzes these claims only with respect to the potential liability of Officer Armstrong and Sergeant Glover.

Plaintiff brings claims for excessive force and unlawful seizure under Section 1983, arguing that his Fourth and Fourteenth Amendment rights were violated. Dkt. No. 1, ¶¶ 10.3–10.5. The Court first assesses whether a seizure has occurred under the Fourth Amendment and next analyzes whether Plaintiff can sustain an excessive force claim even in the absence of an unlawful seizure.

a.  ***Excessive Force Constituting an Unlawful Seizure: Fourth Amendment***

First, the Court assesses whether each officer applied force with the intent to restrain Plaintiff. Under Supreme Court precedent:

> [I]f a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant—even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even when there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Brower v. Cnty. of Inyo*, 489 U.S. 596, 596–97 (1989) (emphases in original). Put simply: "A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor

1   will force intentionally applied for some other purpose satisfy this rule." *Torres v. Madrid*, 592

2   U.S. 306, 317 (2021) (emphasis in original) (internal citation omitted). Courts must look to

3   whether the challenged conduct objectively manifests an intent to restrain; the officer(s)'

4   subjective intent is immaterial. *Id.*

5        Upon establishing that a seizure of a free citizen occurred, the next step in assessing

6   whether law enforcement officers used excessive force is to apply the Fourth Amendment's

7   objective reasonableness standard: "[T]he question is whether the officers' actions are

8   objectively reasonable in light of the facts and circumstances confronting them, without regard to

9   their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 395–97 (1989) (internal

10  citations and quotation omitted).

11       A court must carefully balance "the nature and quality of the intrusion on the individual's

12  Fourth Amendment interests against the countervailing government interests at stake." *Id.* at 396

13  (internal citations and quotation omitted). In evaluating the *Graham* factors, courts consider the

14  totality of the circumstances, including "the severity of the crime at issue, whether the suspect

15  poses an immediate threat to the safety of the officers or others, and whether he is actively

16  resisting arrest or attempt to evade arrest by flight," *id.*, as well as "the type and amount of force

17  inflicted, the severity of the injuries," and "the availability of less intrusive alternatives to the

18  force employed and whether warnings were given," *Hopson v. Alexander*, 71 F.4th 692 (9th Cir.

19  2023) (internal citations and quotations omitted). "Whether the suspect poses a threat is the most

20  important single element." *Id.* (internal quotation omitted) (quoting *Smith v. City of Hemet*, 394

21  F.3d 689, 702 (9th Cir. 2005) (en banc)). The reasonableness of a particular use of force "must

22  be judged from the perspective of a reasonable officer on the scene" while recognizing "that

23  police officers are often forced to make split second judgments—in circumstances that are tense,

24  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

1    situation." *Graham*, 490 U.S. at 397 (quoting *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)); *see also*

2    *Hopson*, 71 F.4th at 698. Due to the highly fact-specific nature of this inquiry, summary

3    judgment in excessive force cases should "be granted sparingly." *Green v. City & Cnty. of S.F.*,

4    751 F.3d 1039, 1049 (9th Cir. 2014) (collecting cases, internal citations omitted).

5        "[T]he objective reasonableness analysis must be conducted separately for each search or

6    seizure that is alleged to be unconstitutional." *Cnty. of L.A., Cal.*, *v. Mendez*, 581 U.S. 420, 428

7    (2017). Parsing through the barebones complaint and Plaintiff's response to the summary

8    judgment motion, it appears that Plaintiff is challenging two sets of actions as constituting one or

9    more unlawful seizures: (1) Sergeant Glover's threatening to shoot Plaintiff, and (2) Officer

10   Armstrong's shooting of Plaintiff. *See* Dkt. No. 1, ¶¶ 4.10 (describing Sergeant Glover's yelling

11   to the car's occupants "something to the effect of, 'get out of the car, do you want to get

12   shot?' "), 4.14 ("As Mr. Gratton was stepping out of the vehicle, Officer Armstrong shot him in

13   the back for no apparent or legitimate reason."); Dkt. No. 36 at 10 (". . . Defendants threatened

14   and informed Mr. Gratton whether he wanted to get shot, and seconds later follow[ed] through

15   on the threat"). The complaint does not even mention Plaintiff's being handcuffed while awaiting

16   medical assistance, and the response brings this circumstance up only obliquely (*see generally*

17   Dkt. No. 1; *see also* Dkt. No. 36 at 11–12), so the Court does not venture into whether

18   handcuffing Plaintiff also constituted an unlawful seizure.

                        (1)    Sergeant Glover's Threats to Plaintiff

19

20       Defendants state in their summary judgment motion that they are unclear whether the

21   complaint alleges an excessive force claim with respect to the actions of Sergeant Glover. *See*

22   Dkt. No. 31 at 15. Plaintiff does not address this ambiguity in his response brief. *See generally*

23   Dkt. No. 36. However, while Plaintiff's response brief, like his complaint, focuses on the

24   excessive force deployed by Officer Armstrong without any mention of Sergeant Glover by

1   name, it does appear that Plaintiff is alleging an excessive force claim against Sergeant Glover

2   given that he included descriptions such as "Defendants threatened and informed Mr. Gratton

3   whether he wanted to get shot, and seconds later following [*sic*] through on the threat." *See* Dkt.

4   No. 36 at 10.

5                                   (a)   Intent to Restrain

6          Plaintiff argues that he was not free to go during the police officers' questioning, and

7   therefore his liberty was restrained despite his not being under formal arrest. Dkt. No. 36 at 12.

8   Though Plaintiff provides little other description of how he was seized by Sergeant Glover, the

9   undisputed facts demonstrate that Sergeant Glover *did* take action to restrain Plaintiff's

10  movement during the questioning.[5] First, Sergeant Glover directed Plaintiff to step outside of the

11  vehicle. Dkt. No. 31 at 5; *see also* Dkt. No. 33-3 at 2:20–2:24. Rather than comply, Plaintiff put

12  his hand on the gear shifter and put the vehicle in reverse. Dkt. No. 31 at 5; *see also* Dkt.

13  No. 33-2 at 11:50–11:55 (showing vehicle reversing); Dkt. No. 33-4 at 11:51–11:55 (same).

14  Second, according to his own report about the incident, Sergeant Glover reached into the vehicle

15  to place it in "park" when Plaintiff attempted to drive away, hit Plaintiff's hand with his

16  flashlight to prevent him from shifting gears a second time, and verbally warned Plaintiff that he

17  could get shot. Dkt. No. 33-11 at 2–3 (Sergeant Glover's incident report dated November 13,

18  2020); *see also* Dkt. No. 31 at 5-7. Therefore, Sergeant Glover expressed both with his words

19  and his actions an intent to restrain Plaintiff.

20

21  [5]The Supreme Court recently opined on the distinction between seizure by force and seizure by acquisition of
22  control (either through "voluntary submission to a show of authority" or through "the termination of freedom of
    movement") and found that both types of seizure may give rise to a Fourth Amendment violation. *See Torres*, 592
    U.S. at 306, 323–25 (holding that woman who continued to drive away from officers after they intended to restrain
23  her by shooting her in the back was nevertheless "seized" and thus a lower court should analyze whether the seizure
    was unreasonable under the Fourth Amendment). Though Sergeant Glover arguably did not acquire control over
24  Plaintiff, he did apply physical force toward him.

(b)    Reasonableness of Use of Force

The amount and type of force Sergeant Glover personally inflicted on Plaintiff was relatively low and proportional to the needs of the moment. Forcefully leaning into the car to manipulate the gear shift was a low-violence way to prevent Plaintiff from driving away from the scene or (accidentally or intentionally) injuring one of the officers with the car. His use of the flashlight to strike at Plaintiff's hand was not reported to have caused any injury and was possibly one of the least dangerous means at his disposal to prevent the car's movement. Sergeant Glover did not pull out a baton or Taser or use the pistol he had in his hand during the encounter. *See* Dkt. No. 31 at 4 (bodycam showing that Sergeant Glover had his pistol pointing towards Plaintiff during the struggle over the gear shift). Indeed, Plaintiff had placed the officers in danger of injury by reversing the vehicle while the passenger door was still open and the officers were standing right next to the car. *See* Dkt. No. 31 at 4, 5. Sergeant Glover's screams could additionally have contributed to and helped constitute a "seizure" of Plaintiff, given his threats of deploying deadly force and use of profanity. However, his actions, when looked at objectively, do not give rise to a constitutional violation given the circumstances; Plaintiff was actively attempting to flee in a car that had been identified as the getaway vehicle at an earlier-in-the-day shoplifting incident and whose plates had been reported stolen, while officers were standing right next to the vehicle. Sergeant Glover deployed a relatively low amount of force against Plaintiff during a time when he posed a threat to officer safety. Though threatening, Sergeant Glover's actions were objectively reasonable given the circumstances.

(2)    Officer Armstrong's Shooting of Plaintiff

(a)    Intent to Restrain

Intentional shootings by police officers qualify as Fourth Amendment seizures. *Torres*, 592 U.S. at 309 (holding that suspect who was intentionally shot by officers even though she

evaded arrest post-shooting had been seized). At the outset, the Court notes that the video

evidence does not provide much of a window into whether the shooting was accidental or

intentional. *See supra* Part I.B. However, Plaintiff provides evidence that "officer [*sic*]

Armstrong stated she 'intentionally fired her rifle at Mr. Gratton.' " Dkt. No. 36 at 6; Dkt.

No. 37-5 at 2.[6] Even though the record tells a more nuanced story than the one Plaintiff tries to

portray, Officer Armstrong's prior statement creates a genuine issue of material fact about

whether Officer Armstrong's use of force was intentional or accidental.

Moreover, the relevant question is not whether Officer Armstrong subjectively intended

to fire her rifle at Plaintiff but rather whether she manifested the requisite objective intent to

restrain Plaintiff (by shooting him or otherwise). *See Torres*, 592 U.S. at 317 ("the appropriate

inquiry is whether the challenged conduct *objectively* manifests an intent to restrain") (emphasis

in original). Even if Officer Armstrong had not shot Plaintiff, her other actions still would have

demonstrated an objective intent to restrain: She banged on the driver's side window with her

---

[6] Defendants object to the Court considering "oblique hearsay" regarding a "written statement by Officer Armstrong in which she purportedly stated she fired intentionally." Dkt. No. 38 at 2–3. Though Plaintiff mis-cites where in the record this statement is described, the Parties appear to be disputing a statement referenced in the Lund Memorandum. The memo states, "[t]he [Tukwila Police] department received Officer Armstrong's written statement on 12/18/20 via email. In it she wrote that she intentionally fired her rifle at Mr. Gratton because she feared for her safety and the safety of other officers." Dkt. No. 33-22 at 2. Both Parties have attached the Lund Memorandum to their summary judgment briefing. Dkt. Nos. 33-2, 37-5. "[A]t summary judgment[,] a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)*, cert denied. sub nom. U.S. Bancorp v. Fraser*, 541 U.S. 937 (2004)); *cf. Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992) (affidavit may be considered on summary judgment despite hearsay and best evidence rule objections where facts underlying the affidavit would be admissible as evidence even if the affidavit itself were inadmissible) (internal citations omitted). Here, the memo would be admissible as an exception to the hearsay rule as a public record. *See* Fed. R. Evid. 803(8). Officer Armstrong's statement within that report would be admissible as non-hearsay from a party opponent. *See* Fed. R. Evid. 801(d)(2). Defendants could potentially raise a best evidence objection, but it appears the email itself will be available for trial. The Court does find quite troubling, however, that Plaintiff misrepresented not receiving the email at issue when it was apparently used at Officer Armstrong's deposition two days after filing the response brief. *Compare* Dkt. No. 37, ¶ 11 (Plaintiff's counsel's declaration stating that Officer Armstrong's written statement "has never been produced in discovery to the Plaintiff") *with* Dkt. No. 40, ¶ 3 (Defense counsel's declaration stating Plaintiff's counsel both used as an exhibit and questioned Officer Armstrong on her written statement). As it appears the email itself will be available at trial—and admissible as non-hearsay from a party opponent—the Court may consider the statement for purposes of this motion.

1   rifle and reached inside the vehicle to grab him. *See* Dkt. No. 31 at 7. Further, Officer

2   Armstrong's bodycam footage shows her training her rifle towards the driver's-side of the

3   vehicle before Plaintiff stepped out of it. Dkt. No. 33-2 at 10:46–10:56 (showing that Officer

4   Armstrong had her rifle pointed toward the driver's-side door prior to its opening); Dkt. No. 33-4

5   at 10:43–10:54 (same).

6                            (b)      Reasonableness of Use of Force

7           Plaintiff argues that "the seizure became unlawful when Officer Armstrong operated her

8   weapon in a way that violated police practices," especially the City of Tukwila's Police

9   Department's cardinal rules governing firearm safety. Dkt. No. 36 at 12.

10          The Court is unable to determine that Officer Armstrong's behavior that led to her rifle

11  discharging (whether accidentally or not) was objectively reasonable at this stage of the

12  proceedings. Making all inferences in Plaintiff's favor, Officer Armstrong pointed a loaded

13  assault rifle without the safety on at a driver who appeared to be unarmed, even though he was

14  exiting a suspicious vehicle as requested after a brief attempted flight. Though Sergeant Glover

15  had warned Plaintiff of the possibility that he would be shot by the police for non-cooperation,

16  Officer Armstrong gave no such warnings. Instead, she used her rifle to rap at the driver's side

17  window—which in itself was found to be a violation of one of the Tukwila Police Department's

18  cardinal rules. Dkt. No. 33-22 at 5 (Lund memorandum). Officer Armstrong had been trained,

19  first by the Jackson, Mississippi, Police Department and then by the Tukwila Police Department,

20  to only let her weapon's muzzle cover things she was "willing to destroy," to place her finger on

21  the trigger only when she is ready to fire at a target, and to keep her safety on until she has made

22  the decision to fire. Dkt. No. 33-22 at 4–5; 33-23 at 2–3 (emails between the Tukwila Acting

23  Deputy Chief of Police and a corporal with the Jackson Police Department). Further, the Tukwila

24

Police Department's internal investigation concluded that Officer Armstrong violated its policy regarding use of force. Dkt. No. 33-22 at 1, 4–6 (Acting Deputy Lund's detailed findings); Dkt. No. 33-12 at 2–3 (Chief Drever's disposition adopting Acting Deputy Lund's findings). The investigation found that "[a]t the moment [Mr. Gratton] was shot[,] he was complying with commands and was not armed, therefore, the use of force was not reasonable based on the circumstances known at the time force was used." Dkt. No. 33-22 at 6.

Per a Renton Police Department investigation report written weeks after the police encounter, at the point when Officer Armstrong fired her rifle, there was no mention in the records available to the investigator of "Gratton being in possession of a weapon, making any movement towards Officer Armstrong or any verbal / nonverbal threatening actions." Dkt. No. 33-8 at 10. The investigator also reported that no deficiencies were found with Officer Armstrong's rifle after it was tested post-shooting. *Id.* at 14, 15.

Officer Armstrong deployed deadly force in responding to the suspicious vehicle call. *Sabbe v. Wash. Cnty. Bd. of Comm'r's*, 84 F.4th 807, 822 (9th Cir. 2023) ("The Ninth Circuit defines deadly force as force that creates a substantial risk of causing death or serious bodily injury." (citing *Hemet*, 394 F.3d at 693)); *Seidner v. de Vries*, 39 F.4th 591 (9th Cir. 2022) (explaining that shooting a firearm is "by definition" a use of deadly force). Based on the evidence presented at this stage, a reasonable jury could conclude that an officer in Officer Armstrong's position would not have believed that Plaintiff posed a "significant threat of death or serious physical injury" to herself or others to warrant the use of deadly force. *Cf. Sabbe*, 84 F.4th at 822 (quoting *Tenn. v. Garner*, 471 U.S. 1, 3 (1985)) (finding that a reasonable jury could conclude that Section 1983 plaintiff who had been armed and intoxicated and had likely fired a weapon nearly two hours earlier was not a safety threat at the time of the police encounter at issue).

As there is thus a genuine issue of material fact regarding whether Officer Armstrong intentionally shot Plaintiff for the purpose of Section 1983 liability and whether her use of force was reasonable, the Court declines to dismiss Plaintiff's unlawful seizure claim based on the facts presented.

   b.   ***Excessive Force in the Absence of an Unlawful Seizure: Fourteenth Amendment***

Plaintiff does not specify the factual or legal grounds for his Fourteenth Amendment claim in either the complaint or his summary judgment briefing. The Court assumes he references the Due Process clause of the Fourteenth Amendment, which provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

Even if no *unlawful* seizure had occurred—*i.e.*, had the challenged actions been unintentional or objectively reasonable—it is not clear that Plaintiff can maintain an excessive force claim under the Fourteenth Amendment based on the very same actions he challenges under the Fourth Amendment. *See, e.g.*, *Cnty. of S.F. v. Lewis*, 523 U.S. 833, 844 (1998) (detailing situations in which a person injured by law enforcement may bring a substantive due process claim under Section 1983 and noting that these only apply outside of the context of some form of "seizure"); *Graham*, 490 U.S. 386 ("Today we . . . hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" (emphasis in original)); *see also Watkins v. City of St. Louis*, No. C21-1344, 2022 WL 4534947, at *4 (E.D. Mo. Sept. 28, 2022) (barring plaintiff from bringing a substantive due process claim based on the same facts used to predicate her Fourth Amendment claim). Here,

1  Plaintiff does not seem to make much, if any, distinction between his Fourth and Fourteenth

2  Amendment excessive force claims. *Compare* Dkt. No. 36 at 6–8 (making arguments regarding

3  intentionality and reasonableness of the use of force regarding "excessive force" claim) *with id.*

4  at 8–13 (making the same types of arguments regarding "unlawful seizure" claim). Moreover,

5  Plaintiff does not clarify how he may have been deprived of his due process rights through the

6  officers' actions. *See generally id.*; *see also* Dkt. No. 1, ¶¶ 10.1–10.5.

7  　　　Regardless of whether Plaintiff has adequately separately stated a Fourteenth Amendment

8  excessive force claim, the Court finds that Plaintiff cannot prevail on such a claim, because he is

9  unable to make the requisite showing that either officer's use of force "shocks the conscience,"

10  as required under precedent. *See Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) ("To

11  determine whether a violation of substantive due process occurred, we look to whether the

12  officers' conduct deprived [Plaintiff of their constitutional] interest in a manner that 'shocks the

13  conscience.' " (quoting *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013))). The

14  Ninth Circuit applies different standards for evaluating what conduct qualifies as conscience-

15  shocking based on how much time was available for a law enforcement officer to contemplate

16  the situation and choose how much force to apply. *See id.* A showing of "deliberate indifference"

17  is required where "actual deliberation was practical" or there was "ample time to correct their

18  obviously wrongful conduct." *Id.* (cleaned up) (internal citations omitted). However, "where a

19  law enforcement officer makes a snap judgment because of an escalating situation, his conduct

20  may be found to shock the conscience only if he acts with a purpose to harm unrelated to

21  legitimate law enforcement objectives." *Hayes*, 736 F.3d at 1230 (quoting *Wilkinson v. Torres*,

22  610 F.3d 546, 554 (9th Cir. 2010), *cert. denied*, 562 U.S. 1219 (2011)); *cf. Porter v. Osborn*, 546

23  F.3d 1131, 1137–40 (9th Cir. 2008) (applying this standard in case where officer faced evolving

24  circumstances and had to take "fast action" and indicating the spectrum of what "shocks the

conscience" will vary based on the amount of opportunity for deliberation (internal citations and quotation omitted)). The purpose-to-harm standard applies "when officials were required to make repeated split-second decisions about how best to respond to a risk, such as during a high-speed car chase or when confronting a threatening, armed suspect," even when "the officer may have helped to create an emergency situation by his own excessive actions." *Peck*, 51 F.4th at 893, 894 (internal citations omitted).

Here, there was inadequate time for deliberation when Sergeant Glover responded to Plaintiff's moving the gear shift or when Officer Armstrong was attempting to subdue Plaintiff as he exited the vehicle. *See Porter*, 546 F.3d 1131, 1139 (holding that a five-minute altercation between a suspect and officer that ended in the officer shooting the suspect did not give the officer ample time to actually deliberate because " 'deliberation' for the purposes of the shocks the conscience test is not so literal a concept"). Applying the purpose-to-harm standard, there is no dispute that Sergeant Glover and Officer Armstrong were each approaching Plaintiff for a legitimate law enforcement objective: They were responding to a suspicious vehicle call regarding a vehicle that may have been stolen and had been involved in a shoplifting crime earlier that day. And the officers needed to make split-second decisions about how to respond when Plaintiff attempted to reverse and then drive the car forward with the three officers standing right next to it. Indeed, less than twenty seconds elapsed between the time Plaintiff put the car in reverse and when Officer Armstrong pulled him out of the car and shot him. Dkt. No. 31 at 7; *see also* Dkt. No. 33-2 at 11:51–12:08.

For the multiple reasons detailed above, summary judgment is appropriate on Plaintiff's Fourteenth Amendment excessive force claim.

### 2.   *Monell* Claims

A municipality can be held directly liable under § 1983 for constitutional injuries

attributable to itself. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 126 (1988) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 463 U.S. 658, 690 (1978)). Such injuries are those that occur "pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). "To establish municipal liability under *Monell*, [a plaintiff] must prove that (1) [they were] deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [their] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. Cnty. Of L.A.*, 977 F.3d 737, 741 (9th Cir. 2020) (internal citation omitted). *Monell* liability does not attach simply because a municipality employs a tortfeasor who violated Section 1983. *See Bd. Of Cnty. Comm'rs of Bryan Cnty., Okla. V. Brown*, 520 U.S. 397, 403 (1997).

Plaintiff's complaint asserts three theories of *Monell* liability: (1) ratification/approval; (2) failure to train; and (3) failure to investigate/discipline prior instances of misconduct. Dkt. No. 1 ¶¶ 11.1–11.3.

As a preliminary matter, though Plaintiff mentions Sergeant Glover a single time in his briefing on the *Monell* claim (*see* Dkt. No. 36 at 15: "Officer Armstrong and Sergeant Glover were taught and believed that they were allowed to use [sic] point and train their firearms at Mr. Gratton and use deadly force"), he makes no argument at all that the City of Tukwila had anything to do with Sergeant Glover's conduct (*see generally* Dkt. No. 36). Given the lack of any material fact regarding municipal liability for Sergeant Glover's conduct, there is quite obviously no dispute of material fact raised in the summary judgment motion.[7] Further, given

---

[7] Indeed, the Court puzzles over Plaintiff's assertion that Sergeant Glover "was taught and believed" that he could use deadly force (Dkt. No. 36 at 15), when the record does not show—and Plaintiff does not argue—that Sergeant Glover used any deadly force. *See Seidner*, 39 F.4th at 596 ("Most often . . . quantifying a particular use of force

Plaintiff's failure to make out any Section 1983 claim against Sergeant Glover, he has caused no constitutional injury attributable to the City of Tukwila. *Monell* does not authorize "the award of damages against a municipal corporation based on the actions of one of its officers when in fact . . . the officer inflicted no constitutional harm." *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *accord Lockett*, 977 F.3d at 741 (affirming grant of summary judgment on *Monell* claims against a local entity after finding no constitutional violation under Section 1983); *Hayes*, 736 F.3d at 1231 (same) (internal citation omitted). Thus, following Plaintiff's lead, the Court only analyzes *Monell* liability with respect to Officer Armstrong's actions.

(1)  Ratification/Approval

"[M]unicipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question," or where an official with final policymaking authority "ratifies a subordinate's decision and the basis for it." *Jessen v. Cnty. of Fresno*, 808 F. App'x 432, 435 (9th Cir. 2020) (first quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion), then quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Ratification "generally requires more than acquiescence." *Sheehan v. City and Cnty. of S.F.*, 743 F.3d 1211, 1231 (9th Cir. 2014). There must be evidence that policymakers "made a deliberate choice to endorse" the officer's actions. *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). State law determines whether a particular official has final policymaking authority. *Jessen*, 808 F. App'x at 435 (citing

---

requires consideration of the 'specific factual circumstances' surrounding the event.") (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017); *cf. Lowry*, 858 F.3d at 1257 (explaining that in a previous case, the Ninth Circuit had determined that use of a police dog did not rise to the level of deadly force "even though the dog apprehended a fleeing suspect with a bite that lasted between forty-five and sixty seconds, 'shredded' the plaintiff's muscles, and reached the bone") (internal citation omitted).

1     *Permbaur*, 475 U.S. at 483).

2        Plaintiff's complaint alleges only the following regarding ratification: "The City, through

3 its approval of the Defendant Officers [*sic*] actions, has ratified [*sic*] the Defendant Officers

4 acted pursuant to the [*sic*] and in a manner consistent with the policies, customs, and practices of

5 the City." Dkt. No. 1 ¶ 11.3a. Not only does this statement leave unclear which officer(s)'

6 actions Defendants are trying to attribute to the City, Plaintiff has provided no factual

7 information to back up this legal conclusion. His summary judgment briefing only barely

8 supplements this allegation, stating that "Defendants ratified Officer Armstrong's behavior by

9 informing and advising her to re-write her statement to cover up that Officer Armstrong stated

10 she did in fact intend to shoot Mr. Gratton on the night of the incident." Dkt. No. 36 at 14 (stated

11 without providing a citation to the relevant record evidence). A perusal of the statement of facts

12 reveals that Plaintiff is relying on the following assertion to make the case that a municipal

13 official with final policymaking authority had ratified Officer Armstrong's decision to shoot

14 Plaintiff "and the basis for it," *see Jessen*, 808 F. App'x at 435:

15          Officer Armstrong stated via email on December 8, 2020, that she
         intentionally fired her rifle at Mr. Gratton. *See* Declaration of Jesse

16          Valdez, Exhibit F, Dkt. 33-22, page 2 of 7. Now officer [*sic*]
         Armstrong via her declaration claims it was "an accident." *See* Dkt.

17          #32. Officer Armstrong then rewrote her report as she was instructed
         and advised by Chief of Tukwila police department and her attorney.

18          *See* Declaration of Jesse Valdez, Exhibit F, Dtk. [*sic*] 33-22, page 6
         of 7.

19

20 Dkt. No. 36 at 4.

21        Plaintiff makes too much of too little, even misquoting the scant evidence he attempts to

22 marshal. Officer Armstrong's declaration for this case, dated June 22, 2023, states in relevant

23 part: "As I struggled to remove [Plaintiff] from the vehicle, a round accidentally discharged from

24 my rifle which was in my right hand, striking the driver in the shoulder." Dkt. No. 32, ¶ 9

(Declaration of Jessica Armstrong). And while Plaintiff does correctly report that there is evidence that Officer Armstrong sent an email on December 8, 2020, stating that she intentionally fired her rifle at him, *see* Dkt. No. 33-22 at 2, he misrepresents the police department's involvement in her change of narrative. The document cited is Acting Deputy Chief Lund's memorandum to the Chief of Police, and it contains absolutely no support for a claim that the Chief had instructed or advised her to rewrite or otherwise revise her statement. *See generally* Dkt. No. 33-22. Rather, the memorandum reflects that Officer Armstrong's attorney had advised her that the Chief would not accept a statement about the encounter that amounted to "I don't know [how the weapon fired]." *Id.* at 6. Plaintiff has not established that *anyone* within the municipality, let alone a final policymaker, had endorsed her shooting of Plaintiff in any way. He does not allege or show, for example, that the attorney who advised Officer Armstrong was a policymaker within the City of Tukwila or even employed or otherwise provided to her by the City. He has merely shown that Officer Armstrong has presented an inconsistent narrative about the encounter to her superiors. This tends to support Defendants' argument that "it is unclear on what good-faith basis a ratification claim can even be made." *See* Dkt. No. 31 at 16.

Defendants go on to provide undisputed evidence that the police department *disapproved of* Officer Armstrong's decision to shoot Plaintiff by immediately placing her on administrative leave after the shooting, finding that she had violated multiple departmental policies, and providing remedial trainings. *Id.* at 16–17. While the City of Tukwila could have done more to discipline or otherwise reprimand Officer Armstrong for her misconduct, it most certainly did not condone or otherwise "endorse" it. *See Gillette*, 979 F.2d at 1348.

(2)   Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train [its employees]." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

To prevail on such a claim, a party must show that by failing to train its employees in a relevant respect, the municipality has been deliberately indifferent to the rights of those persons with whom their un- or under-trained employees come into contact. *Id.* "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. In all but a narrow range of circumstances, this requires showing "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62, 63–64. As the Supreme Court has long cautioned:

> [simply proving] that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct[, is inadequate]. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*City of Canton*, 489 U.S. at 391.

Plaintiff points to multiple deficiencies that Officer Armstrong has herself identified in her training to argue that the City of Tukwila should be held responsible for failing to adequately train her. *See* Dkt. No. 36 at 14. Specifically, he points to Officer Armstrong's statements while being interviewed as part of the City's internal investigation into the shooting that she had not been trained on the following areas: safety with her rifle, contact and cover, same-side approaches of vehicles, and how to handle her rifle when needing to "go hands on" with someone. *Id.* (paraphrasing from Dkt. No. 37-6). Plaintiff also argues that Officer Armstrong violated the trainings she was given. *Id.* The record reflects that Officer Armstrong was trained

by both the Jackson and Tukwila police departments on four cardinal rules regarding firearm use and to keep the safety on her rifle until ready to shoot. *See* Dkt. No. 33-21 at 3; Dkt. No. 33-22 at 5; Dkt. No. 33-23 at 2–3. Indeed, just four days before the encounter at issue, Officer Armstrong attended a firearms safety training which covered the four cardinal rules and low-light, inclement weather rifle tactics. *See* Dkt. No. 31 at 19 (citing Dkt. No. 33-21).

Plaintiff fails to connect the alleged lack of training to Officer Armstrong's actions, which is particularly relevant here given that she admittedly failed to correctly apply the training she had received on the night of the shooting. He also presents no other instances in which the City failed to train law enforcement employees. Even allegations of "infrequent and insufficient" training have been found inadequate to sustain a failure-to-train *Monell* claim when based on a single incident. *Johnson v. City of San Jose*, 591 F. Supp. 3d 649, 667 (N.D. Cal. 2022) (dismissing *Monell* claim where police officer's inadequate training did not qualify as a "rare" case in which "a single incident [can] form the basis for failure to train liability" (citing *Connick*, 563 U.S. at 64))*;see also Jessen*, 808 F. App'x at 432 ("Even assuming, without deciding, that Defendants' training policies are inadequate, there is no evidence that 'the need for more or different training [was] so obvious' that Defendants were deliberately indifferent to [the plaintiffs'] rights" (quoting *City of Canton*, 489 U.S. at 390)). Here, Plaintiff's evidence fails to meet the high bar necessary to show that the City of Tukwila should be held liable for failure to train Officer Armstrong.

(3)    Failure to Investigate/Discipline Prior Misconduct

A municipality's failure to investigate and discipline employees "in the face of widespread constitutional violations . . . can support an inference that an unconstitutional custom or practice has been unofficially adopted." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). "We have long recognized that a custom or practice can be inferred from

widespread practices or evidence of repeated constitutional violations for which the errant

municipal officers were not discharged or reprimanded." *Id.* at 1233 (quoting *Gillette*, 979 F.2d

at 1349).

In summary judgment briefing, Plaintiff does not even mention the city of Tukwila's

alleged failure to investigate or discipline prior misconduct. *See* Dkt. No. 36 at 13–16. And the

complaint only states the following legal conclusions:

> As a matter of both policy and practice, the city of Tukwila has
> facilitated the very type of misconduct at issue here by failing to
> adequately investigate, punish and discipline prior instances of similar
> misconduct, thereby foreseeably leading its officers to believe their
> actions will never be meaningfully scrutinized, and in that way,
> encouraging and predictably resulting in unreasonable uses of
> excessive force such as those the Plaintiffs [*sic*] complain of . . . .

Dkt. No. 1, ¶ 11.3c. Plaintiff utterly fails to point to evidence of prior or other instances of police

misconduct and how they were handled by the City of Tukwila. Coupled with Defendants'

presentation of evidence that the shooting was investigated internally as well as by the Renton

Police Department and that Officer Armstrong was disciplined, as described in detail *supra*,

summary judgment on this claim is warranted. Additionally, Defendants assert that Officer

Armstrong had never previously faced an excessive force complaint or even fired her weapon

while on duty, went through the police academy and was certified as a police officer under state

guidelines, and had received rifle training. Dkt. No. 31 at 21 (no record citations provided); *see*

*Nunez v. City of San Jose*, 381 F. Supp. 3d 1192, 1214 (N.D. Cal. 2019) (dismissing *Monell*

claims at summary judgment based on similar showing); *cf. Hernandez v. Fed'l Way*, 456 F.

Supp. 3d 1228, 1237 n.1 (W.D. Wash. 2020) (dismissing *Monell* claim where complaint did not

allege the requisite elements and plaintiff failed to address defendants' arguments regarding the

claim in opposition to summary judgment).

In general, Plaintiff's complaint includes only conclusory allegations regarding the municipality's liability. And despite the opportunity to provide more information in the context of the summary judgment motion, Plaintiff provides inadequate (if any) evidence that could support his claims that the City of Tukwila either ratified or approved Officer Armstrong's conduct, that it failed to adequately train her, or that it failed to investigate or discipline prior misconduct. For the reasons detailed above, the Court FINDS that Plaintiff's *Monell* claims fail and DISMISSES them.

3.     **Washington Law Against Discrimination**

Plaintiff asserts claims under WLAD based on racial discrimination, alleging that because he is African American, "Tukwila Law enforcement immediately treated Mr. Gratton as a dangerous subject," even though he "was not in possession of any weapons and was not a danger to anyone at the time officers began pointing guns at him," he did not make "any threats toward law enforcement," and he attempted to "follow their commands." Dkt. No., 1 ¶¶ 5.1–5.10.

Plaintiff provides no authorities to support his WLAD claim in a context outside the parameters of "employment, in credit and insurance transactions, in places of public resort, accommodation, or amusement, and in real property transactions." *See* RCW 49.60.010; *see also* Dkt. Nos. 1, 36. The most applicable right that Plaintiff can claim he has been deprived of under the WLAD is "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges or any place of public resort, accommodation, assemblage or amusement" on account of his race. RCW 49.60.030(1)(b). An illustrative definition in the Washington Code explains in relevant part that such locations:

> include[], but [are] not limited to, any place, licensed or unlicensed, kept for gain, hire or reward, or where **charges are made for** admission, service, occupancy, or use of any property or facilities, whether conducted for . . . public conveyance or transportation on land, water, or in the air, including the stations and terminals thereof

and the garaging of vehicles, . . . **or where the public gathers**, congregates, or assembles for amusement, recreation, or public purposes . . . .

RCW 49.60.040 (emphases added). Neither the residential street nor the personal vehicle where the police encounter occurred would likely qualify as a place of public resort, accommodation, or amusement under this definition. However, even assuming that he was in a location covered by the WLAD, Plaintiff must additionally show that that he was treated unfairly or unequally because of his race, color, or national origin. *See Owusu v. Bank of Am., N.A.*, No. C15-1606, 2016 WL 4742487, at *5 (Aug. 9, 2016), *report & recommendation adopted*, No. C15-1606, 2016 WL 4761940 (explaining that Washington courts have applied WLAD to arrests in public places but to prevail under the statute, a plaintiff must show "that the unequal treatment was *motivated* by race") (quoting *McKinney v. City of Tukwila*, 103 Wash. App. 391, 410–11, 13 P.3d 631 (2000) (emphasis in original)).

In *McKinney*, African American appellants claimed that White police officers discriminated against them based on their race because they detained their car, while White people in the park were not detained. 103 Wash. App. at 410. But the court was unable to find that the officers' conduct was racially motivated because the stop was initiated based on information provided by a crime victim and there was no evidence that the officer requesting the stop knew that the vehicle's occupants were African American. *Id*. at 411. In another case, appellants who were approached by police officers while fishing in an area known for criminal activity could not show that their race was a "substantial factor" in the differing treatment they received from police officers compared to fishers of a different race at the other end of the lake, whom the officers did not approach. *Disnute v. City of Puyallup*, 553 F. App'x 734, 736 (9th Cir. July 15, 2013) (unpublished).

Similarly, here, the officers decided to approach the vehicle because its plates had been reported stolen and matched the plates on a getaway vehicle from a shoplifting call earlier in the day. Dkt. No. 31 at 3. Initially, the officers were not even sure the vehicle was occupied, let alone aware of the race of its occupants. *Id.* at 2. While "Plaintiff argues it is more likely than not that Sgt. Glover asked the Plaintiff if he wanted to get shot because he is African American," and that "Armstrong criminalized him because he is African American, weaponizing his skin color even though he was unarmed," he provides no evidence to support these assertions about the officers' intent. *See* Dkt. No. 36 at 17. Referencing the history of over-policing of African Americans in this country (*see id.*) is not enough to establish that in this specific instance, the officers' actions were racially motivated. In this case, there is an undisputed, race-neutral explanation for the shows of force by Sergeant Glover and Officer Armstrong: Plaintiff's attempt to escape arrest by placing the car in reverse and then attempting to place the car in drive while being questioned. Plaintiff has failed to establish a triable issue of material fact on his racial discrimination claim under WLAD, which shall be DISMISSED from this action.

### 4.   Tort of Outrage

Plaintiff next asserts a claim based on the tort of outrage. To establish this tort, he must show: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich*, 109 Wash. 2d 48, 61, 742 P.2d 1230 (1987) (internal citations omitted). Additionally, the Washington Supreme Court has held that the tort of outrage "should allow recovery only in the absence of other tort remedies." *Id.* at 62 (referencing Restatement (Second) of Torts § 46, comment *b*, at 72 (1965)); *accord John v. Rogers*, No. C-, 2014 WL 12029281, at *9 (W.D. Wash. Aug. 19, 2014) (barring plaintiff from recovering under both the tort of outrage and another theory under the same set of facts).

1      Defendants are not seeking summary judgment on Plaintiff's negligence claim, under

2  which Plaintiff may be able to recover damages for mental or emotional distress. *See* Dkt. No. 36

3  at 25. Plaintiff does not address the issue of potential double-recovery, nor does he cite any

4  authorities to support the inclusion of both negligence and outrage claims. *See* Dkt. No. 36 at 16.

5  Therefore, the Court DISMISSES the outrage claim.

6      5.     **Negligence Claims Against Sergeant Glover**

7      Defendants argue in their summary judgment motion that "it is unclear whether Plaintiff

8  even makes a negligence claim against Sgt. Glover." Dkt. No. 31 at 26. Indeed, the allegations in

9  the complaint regarding negligence generally reference "officer" in the singular or use "she/her"

10 pronouns and do not mention Sergeant Glover. *See* Dkt. No. 1, ¶¶ 7.1–7.7. Plaintiff's response

11 brief to the summary judgment motion similarly does not mention a negligence claim against

12 Officer Glover. *See* Dkt. No. 36. There is therefore no evidence or argument supporting a

13 negligence claim against Sergeant Glover. To the extent it is asserted, any negligence claim

14 against Sergeant Glover is hereby DISMISSED.

15     6.     **Indemnification**

16     Defendants claim to be seeking summary judgment on all but two of Plaintiff's claims.

17 Defendants assert that "Plaintiff has a colorable negligence claim against Officer Armstrong, and

18 against the City of Tukwila under *respondeat superior*." Dkt. No. 31 at 1. Defendants go on to

19 state that "the various other claims Plaintiff makes are without basis." *Id.* However, their motion

20 fails to address Plaintiff's claim that "pursuant to state law, the City of Tukwila must indemnify

21 the officers for any judgment against them." Dkt. No. 1, ¶¶ 8.1–8.3. Defendants might consider

22 the indemnification claim in the same vein as the *respondeat superior* claim. In any event, as no

23 argument is raised by Defendants with regard to the indemnification claim and for purposes of

24

1  clarity, Plaintiff may seek indemnification and recover damages accordingly against the City of

2  Tukwila.

3  **B.  Amendment of Answers**

4       The Court set a deadline of March 31, 2023, for the Parties to file amended pleadings.

5  Dkt. No. 21 at 2. On June 15, 2023, Defendants filed a motion to amend their answer to add an

6  affirmative defense. Dkt. No. 26. Defendants seek to add "the felony bar" defense—given that

7  possession of a stolen vehicle is a felony (*see* RCW 9A.56.068)—to their respective answers. *Id.*

8  at 5. The felony bar provides a complete defense to actions for damages due to an injury

9  sustained by someone during their commission of a felony, provided that the felony was a

10  proximate cause of that injury. *See* RCW 4.24.420 (2020 ed.).[8] However, this defense cannot be

11  used to bar claims brought under 42 U.S.C. § 1983. *Id.* Plaintiff points out that the felony bar

12  defense could completely bar his negligence claim, which is still before the Court. *See* Dkt.

13  No. 29 at 8.

14       "A scheduling order 'is not a frivolous piece of paper, idly entered, which can be

15  cavalierly disregarded by counsel without peril.' " *Mammoth Recreations*, 975 F.2d at 610

16  (internal citation omitted). Once a district court files a pretrial scheduling order pursuant to

17  Federal Rule of Civil Procedure 16 establishing a timetable for amending pleadings, it is the Rule

18  16 standard that controls. *Id.* at 607–08. A party seeking to amend a pleading after the date

19  specified in scheduling order must first show "good cause" for amendment under Rule 16(b), and

20  only if "good cause" is shown does the analysis proceed to whether a party can demonstrate that

21

22  ---

[8] Defendants seek to use the 2020 version of RCW 4.24.420. This statute was revised in 2021 to require a finding by the trier of fact that the person was engaged in the commission of a felony at the time of the injury "beyond a reasonable doubt." *See* Dkt. No. 26 at 5; RCW 4.24.420 (2021 ed.). Defendants have used the 2020 version because it was the version in effect at the time of the police encounter in question. Dkt. No. 26 at 5 n.1. Plaintiff makes no objection to use of the 2020 version rather than the revised statute in contesting Defendants' ability to raise the felony bar defense. *See generally* Dkt. No. 29.

23

24

1    amendment is proper under Rule 15. *Id.* at 608; *see also EEOC v. Bakery*, No. C13-4507, 2016

2    WL 1301173, at *2 (N.D. Cal. Apr. 4, 2016). Here, good cause must exist for the Court to allow

3    Defendants to amend their respective answers, because the motion was filed after the Court's

4    scheduled deadline for amending the pleadings.

5         Defendants assert that "the *only* reason the defense was not raised earlier is the extent and

6    complexity of the investigative materials flowing from this incident, and confusion about

7    Plaintiff's extensive prior and subsequent criminal history." Dkt. No. 26 at 6 (emphasis added).

8    Plaintiff claims that there is "no justifiable explanation" for the failure to amend by the Court-

9    ordered deadline, given that "Defendants knew or should have known" by the time the complaint

10   was filed that the plates and/or vehicle had been reported stolen. Dkt. No. 29 at 7. Defendants

11   assert that Plaintiff's criminal history (specifically, being charged with being in possession of a

12   *different* stolen vehicle) "complicated the facts, and caused a delay in understanding which

13   incidents are referred to in the records collected." Dkt. No. 26 at 7. They attempt to refute that

14   "the City of Tukwila was fully aware from the beginning that the vehicle was stolen," because

15   the vehicle was reported stolen in a different city, and the City of Tukwila was sequestered from

16   the independent investigation until its completion. Dkt. No. 35 at 4.

17        The Court agrees with Plaintiff, as it appears that Defendants were not diligent in seeking

18   an extension. Defendants obfuscate the timeline during which they learned that Plaintiff was in a

19   stolen vehicle on the night of the police encounter. *See* Dkt. No. 26 at 3 ("Following the

20   shooting, independent investigators discovered . . . the vehicle itself was stolen."); *id.* at 7 ("the

21   fact that the vehicle was found to be stolen barely merited mention in the investigative files" and

22   "it was only recently that defense counsel confirmed the vehicle Plaintiff was driving at the time

23   of this incident was, in fact, stolen"); Dkt. No. 35 at 3 (explaining that the City of Tukwila "was

24   not provided access to the investigatory file, or any of the related reports, until the investigation

had been completed" without specifying when the investigation had been completed).

Defendants' own attachments to the motion to amend indicate that they were not adequately

diligent in seeking an extension, as they should have had enough information prior to the

amendment deadline to make a good-faith assertion that Plaintiff had been in a stolen vehicle.[9]

*See* Dkt. No. 27-4 (stolen vehicle report dated November 20, 2023); Dkt. No. 27, ¶ 2.E

(confirming the contents and date of Dkt. No. 27-4); Dkt. No. 27-5 at 4 (Burien Police

Department reports from September 2020 showing that Plaintiff had likely stolen his neighbor's

vehicle); Dkt. No. 27-6 (King County Prosecuting Attorney's information sheet charging

Plaintiff with possession of a stolen vehicle on February 10, 2022). Defendants knew from the

night of the encounter two and one-half years before the motion was filed that the plates on the

vehicle Plaintiff was in had been reported stolen. *See* Dkt. No. 27-1 at 2 (Sergeant Glover's

incident report dated November 13, 2020); Dkt. No. 27-3 at 2 (Officer Greenhill's incident report

dated November 13, 2020); *see also* Dkt. No. 26 (motion to amend filed June 15, 2023). Given

this fact, it strains credulity to believe that the City of Tukwila and its legal representatives

would not immediately consider whether the vehicle itself was stolen.

In any event, the Court finds that the two and one-half year gap results in a finding that

Defendants were not diligent in their efforts to amend their answer. The Court also notes that at

the time Defendants filed their motion: over seven months had passed since the complaint was

filed; nearly five months had passed since Defendant Armstrong had filed her answer to the

complaint and over three months had passed since Defendants City of Tukwila and Glover filed

---

[9] Additionally, the evidence Defendants marshal in support of summary judgment indicates that the City of Tukwila likely had access to the independent investigation files in which the vehicle would have been noted as stolen over one year before the pleadings amendment deadline. For example, the Tukwila Police Chief references the review by the independent investigators in his disposition of the City's formal investigation of the shooting, dated March 18, 2021. Dkt. No. 33-12 at 3.

their answers; the request was made two and one-half months after the deadline for filing

amended pleadings; and the Parties were over five months into discovery. *See* Dkt. No. 13

(Order setting January 9, 2023, as the Rule 26(f) conference deadline); Dkt. No. 16 (Joint Status

Report filed after Rule 26(f) conference). Defendants could have raised the felony bar defense

with greater diligence at the very outset of the case. The Court therefore DENIES Defendants'

motion to amend.

## IV.   CONCLUSION

(1)     Defendants' motion for partial summary judgment (Dkt. No. 31) is GRANTED IN

PART and DENIED IN PART. All claims against Sergeant Glover are DISMISSED from this action.

Summary judgment is GRANTED with respect to Plaintiff's Fourteenth Amendment Section 1983

claim, *Monell* claims, WLAD claim, and claim under the tort of outrage. Summary judgment is

DENIED on Plaintiff's excessive force claim under the Fourth Amendment with respect to Officer

Armstrong and his request for indemnification of the City of Tukwila.

(2)     Defendants' motion to amend their respective answers (Dkt. No. 26) is DENIED.

(3)     The Parties are DIRECTED to submit a Joint Status Report discussing the prospects

for settlement as well as whether (and if so, how) the Court should modify the current pre-trial

schedule **within seven (7) days of this Order**.

Dated this 13th day of February 2024.

Tana Lin
United States District Judge